

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-26-2001

# United States v. Richards

Precedential or Non-Precedential:

Docket 99-3966

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"United States v. Richards" (2001). *2001 Decisions.* Paper 33.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/33

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed February 26, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-3966

UNITED STATES OF AMERICA,

v.

DON RICHARDS,
        Appellant

Appeal from the District Court of the V irgin Islands
(Divisions of St. Thomas and St. John)
(D.C. Crim. No. 98-cr-00227-1)
District Judge: Honorable Thomas K. Moore

Argued
December 5, 2000

Before: MANSMANN and ALITO, Circuit Judges,
and ACKERMAN, District Judge.*

(Filed: February 26, 2001)

        James A. Hurd, Jr.
         United States Attorney
        Carl F. Morey (Argued)
         Assistant U.S. Attorney
        Office of the United States Attorney
        1108 King Street, Suite 201
        Christiansted, St. Croix
        USVI, 00820

         Counsel for Appellee
_____

* Honorable Harold A. Ackerman, United States District Judge for the
District of New Jersey, sitting by designation.

          Richard Della Fera, Esquire (Argued)
          Alvin E. Entin, Esquire
          Entin, Margules & Della Fera, P.A.
          200 East Broward Boulevard
          Suite 1210
          Fort Lauderdale, FL 33301

           Counsel for Appellant

OPINION OF THE COURT

MANSMANN, Circuit Judge.

Don Richards appeals his conviction for crimes involving the robbery[1] of a Brink's ar mored van in St. Thomas, the Virgin Islands. He contends that he is entitled to a new trial for three separate reasons: (1) violation of his Sixth Amendment right arising from the admission of an out-of-court statement given by a non-testifying co-defendant; (2) violation of the Jencks Act based on the gover nment's failure to produce an FBI agent's written report concerning the co-defendant's oral statements; and, (3) jur or misconduct.

We conclude that the admission of the co-defendant's statement violated Richards' Sixth Amendment right to confront witnesses under Bruton v. United States, 391 U.S. 123 (1968). Richards' failure to object to this admission during trial, however, allows him relief only if the plain error tenets of Fed. R. Crim. P. 52(b) apply. Under this doctrine, we find that the error was not r eversible. Overwhelming evidence of Richards' guilt exists independent of the statement; therefore, no manifest injustice occurred at trial.

The Jencks Act argument fails for the identical reason. We hold that the government's failur e to produce the FBI

_____

1. Richards was found guilty of conspiracy in violation of 18 U.S.C. S 371, interference with commer ce and aiding and abetting in violation of 18 U.S.C. SS 1951 and 2; possession offirearm during crime of violence in violation of 18 U.S.C. S 924(c)(1); and, first degree robbery and aiding and abetting in violation of 14 V .I.C. SS 1862(2) and (11).

agent's written report of the co-defendant's oral statement violated the Act, but Richards' concomitant failure to object necessitates plain error review. As with the Sixth Amendment issue, because the fairness of the trial was not seriously affected, a new trial is not justified.

Finally, we hold that the District Court did not abuse its discretion in denying two motions for mistrial based on juror misconduct. Deciding the first motion alleging intra-jury influence would require the court delving into the juror's deliberative process -- an inquiry prohibited by Fed. R. Evid. 606(b). The second motion alleging jur or bias was unfounded. The juror acknowledged during voir dire that he knew one of the government witnesses but r emained capable of impartially evaluating the evidence. Ther e is no evidence to demonstrate that the juror disr egarded his obligation to remain unbiased.

We will, therefore, affir m.

I.

Don Richards and Theodore Greenaway were tried jointly on the offenses arising from the r obbery of the Brink's armored van. According to the trial testimony, Richards and Greenaway ambushed the Brink's messenger , Mark Kuffy, and Richards put a gun to Kuf fy's head, demanding money. Richards hit Kuffy in the head with the gun and knocked him to the floor of the van. He then collected the bags of money from the van and tossed them to Greenaway.

Two days after the robbery, the driver of the van, Ignatius Stevens, confessed to being the inside man in the r obbery. He identified Richards as the person who assaulted Kuffy and Greenaway as his accomplice.

Greenaway was arrested and interviewed by law enforcement officers. In his interview Gr eenaway revealed that "Don and the other guy who works for Brink's planned the robbery." Greenaway then signed a written confession conceding participation in the robbery, but withholding the name of the individual collaborating in the crime. FBI Special Agent Steven Harker documented the interview, including Greenaway's oral statement, in an FBI FD302

3

report. When Richards was arrested later that day he made no statement.

Richards and Greenaway were tried jointly. In pretrial discovery, Richards' counsel received a r eport authored by Special Agent Harker, which informed that Greenaway confessed that he and his "friend" had committed the robbery. The report noted that Greenaway declined to give a name to his "friend."

At trial, Stevens, the Brink's driver, testified that he and Richards planned the robbery for two weeks. On the day of the crime, he observed Richards walk by the van, turn around and walk back. Although Richards was sporting Rastafarian dreadlocks and sunglasses, Stevens recognized Richards by his distinctive walk (a pronounced limp).

Stevens then testified that on the following mor ning he met with Richards, who told him that he hid Stevens' share of the money, $25,000, in a particular location. At that designated spot, Smith retrieved the money.

Special Agent Harker testified next and read Greenaway's written statement into the record. The portion relevant to this appeal follows:

> The first time I heard about the idea of r obbing the Brink's armored van was when a friend, whom I do not wish to name, spoke to me about it. He and I talked and my friend told me it would be easy to rob the armored car since there was an inside man. . . . The next time I met with my friend was on the day of the robbery.

The statement continued with the description of the different roles Greenaway and his "friend" played in the robbery.

On cross-examination, Richards' attor ney asked Special Agent Harker whether Greenaway had mentioned Richards by name. The exchange was as follows:

> Q: Mr. Harker, the statement Mr . Greenaway made, he made this statement after you had Mr. Richards in custody, correct?
>
> A: Yes, that's correct.

4

Q: And you questioned Mr. Greenaway, right?

A: Yes, I did.

Q: About who is his friend, correct?

R: That's correct.

Q: And he never told you his friend was Don Richards, correct? That the friend that he refers to in here is Don Richards.

A: (Pause)

Q: You don't remember?

A: I do remember.

Q: Tell me who he said his friend was since you know.

A: He told me that he had a friend named Don, yes.

Q: Excuse me?

A: He told me he had a friend named Don.

Q: But Don is not the friend that he is r eferring to as committing the robbery with him?

A: That is not correct.

Q: That's not correct?

A: That is not correct.

Q: You're saying the friend he r eferred to in here is Don Richards? That's what you are saying?

A: What I'm saying is that when we interviewed Mr . Greenaway, in the beginning of the interview--

At this point, the attorney for the gover nment requested a side bar conference:

MR. ADAMS: One of the things that we want to take evidence is to prevent a Bruton problem with one defendant Greenaway implicating the other defendant.

THE COURT: That's only in the Gover nment's case. So what is your problem?

MR. ADAMS: One of the reasons my agent is hesitated (sic) --

THE COURT: You told him never to mention it. That is on your examination, not defense counsel's examination.

MR. ADAMS: I want to make sure you r ealize that.

On redirect, the government further explored the mention of Richards in Harker's interview with Gr eenaway:

Q: You were asked questions by [the defense attorney] about whether or not the defendant during your conversations with him mentioned Don Richards at all; do you remember that?

A: Yes, I do.

Q: He doesn't mention it in the written statement, correct?

A: That is correct.

Q: Does he mention Don Richards' name at all during the time you interviewed him, that night?

A: He mentioned the name of Don during the interview.

Q: Tell us why that name came up, why did he mention that name?

A: In the beginning of the interview, one of the things we asked him -- because of the information we developed during the case was, we did not believe that he was the number one participant, the head king pin in this. So we asked him, we said, I said to him, "you weren't the one who planned this, were you? And Mr. Greenaway's r esponse was no, that was Don and the other guy who works for the Brinks, for Brinks.

Then, on recross, it was first ascertained by the defense that Harkin's FD302 report reiterated Gr eenaway's oral statement implicating Richards.

Q: Mr. Harker, of course you don't have any memorandum of that statement, correct?

A: That's not correct.

Q: You have one?

A: I don't have one on my person, no.

Q: Does the U.S. Attorney have one?

A: He has, yes.

Q: The memorandum of that kind of information?

A: We did a report, an FD302 to that effect, yes. It would have accompanied or should have accompanied the statement.

THE COURT: You don't have it, counsel?

MR. WATLINGTON: Of course not, your Honor.

When the government was questioned about Harker's FD 302 Report, it responded that although the document had been produced in discovery, it was not disclosed because the government had made a conscious decision that the evidence should not go in to avoid the Sixth Amendment dilemma which surfaces in joint trials of co-defendants. The report was then provided to defense counsel.

After some discussion of the complication posed by Harker's testimony, the court asked the parties how they wished to proceed. Both defense counsel concurr ed that they were ready to proceed and no objection was made.

The trial progressed. The remaining significant testimony introduced by the prosecution was elicited from Richards' mother, who testified that Greenaway and Richards were "friends." This testimony obviously led the jury to assume that the "friend" mentioned in Greenaway's statement was Richards.

When it came time to instruct the jury, at the government's request the District Court instructed the jury not to consider the portion of Special Agent Harker's testimony relating to Greenaway's statement referring to "Don." There were no objections to the jury charge.

Three months after the jury delivered its guilty verdict on all counts, Richards filed a motion for a new trial based on the affidavit submitted by an alternate jur or, Jasha Joseph.

7

The affidavit alleged that during the trial two other jurors, in the presence of other members of the panel, had opined that Richards was guilty. The District Court denied the motion without a hearing because disposition of the motion would require an inquiry into jury deliberations prohibited by Fed. R. Evid. 606(b).

Six months after the verdict, but prior to sentencing, Richards filed a pro se motion for a new trial concerning the juror, who was eventually elected jury foreman, and that juror's familiarity with the government's chief witness, Ignatius Stevens, and Stevens' family.

During sentencing, the District Court reviewed the transcript of the voir dire of the juror in question. The juror acknowledged that he knew Stevens but assured the court that he would judge the case strictly on the evidence. The District Court noted that defense counsel questioned the prospective juror but did not challenge his selection. The District Court, therefore, denied this second motion for a new trial.

Richards was sentenced to 121 months of imprisonment on the Hobbs Act charge and 60 consecutive months of imprisonment on the firearms charge. The sentence imposed on the Virgin Islands charges was ordered to run concurrent with the federal charges. A notice of appeal was filed.

We have jurisdiction under 28 U.S.C. S 1291.

II.

In Bruton v. United States, 391 U.S. 123 (1968), Bruton and his co-defendant, Evans, were tried jointly before a jury. At trial, a federal officer testified that Evans had confessed to the robbery and had implicated Bruton in his confession. The judge instructed the jury that it should consider Evans' confession solely in determining Evans' guilt and that it should disregard the confession with regard to Bruton's involvement.

The Supreme Court reversed Bruton's conviction, holding that the introduction of a non-testifying co-defendant's confession implicating Bruton violated the accused's right

8

to confront witnesses secured by the Confr ontation Clause of the Sixth Amendment. Id. at 126. The Court emphasized the significance of the confession to bolster the prosecution's case against Bruton, observing that "Evans' confession added substantial, perhaps even critical, weight to the Government's case in a form not subject to cross-examination since Evans did not take the stand.[Bruton] was thus denied his constitutional right of confr ontation." Id. at 128.

The Court also expressed doubts regar ding the remedial effect of a curative instruction in the Bruton context. The Court determined that where the incriminating statements of a co-defendant, "who stands accused side by side with the defendant, are deliberately spread before a jury in a joint trial," the risk that the jury may not follow the instruction is too profound. Id. at 135-36.

A later case, Richardson v. Marsh, 481 U.S. 200 (1987), limited Bruton's scope. In Richar dson, the confession of a co-defendant, Williams, was redacted to omit reference to co-defendant Marsh. Later in the trial, however , Marsh testified in such a way, that, despite the r edacted confession, the jury might deduce that Marsh participated in the crime because of Williams' confession. The Supreme Court held that the redacted confession fell outside Bruton's scope because it was evidence r equiring "linkage," i.e., it became incriminating only when linked with evidence introduced later at trial. Id. at 208.

Most recently, in Gray v. Maryland, 523 U.S. 185 (1998), Anthony Bell confessed to the police that he, defendant Gray and another man beat a man to death. Bell and Gray were tried jointly. A redacted statement of Bell's confession was read by a detective substituting "deleted" or "deletion" when Gray's name appeared. After reading the confession, the detective answered affirmatively to the prosecutor's question whether the officer was able to arr est Gray after Bell's statement.

The Supreme Court held that the confession in Gray, which substituted "blanks" and the wor d "delete" for Gray's proper name, fell within the class of statements to which Bruton's protective rule applied. Unlike Richardson's

redacted confession, the confession in Gray referred directly to Gray's existence. Thus the Court determined that redactions that simply replace a name with a blank space or a word such as "deleted" so closely resemble Bruton's unredacted statements that the same legal result is warranted. Id. at 195. The Court posited that a jury will often react similarly to an unredacted confession and a confession redacted in the Gray manner, because the jury could easily recognize that the confession refers to the defendant. The juror "need only lift his eyes to the [co-defendant], sitting at counsel table" to determine to whom the deletion refers. Id. at 193.

In the present case, the government contends that the Bruton error came about only after the defendant's cross-examination of Special Agent Harker. We disagree. The initial reading of the confession of Greenaway violated Bruton. Greenaway's reference to his "friend" was just as blatant and incriminating of Richards as the word "deleted" in the Gray case. In Gray, the Court held that the following redaction violated Bruton:

> "QUESTION: Who was in the group that beat Stacey?
>
> "ANSWER: Me, deleted, deleted, and a few other guys."
> . . . .
>
> Why could the witness not instead have said:
>
> "QUESTION: Who was in the group that beat Stacey?
>
> "ANSWER: Me and a few other guys."

Gray, 523 U.S. at 208.

Greenaway's statement here was similar. Greenaway's statement referred to the existence of three participants in the crime -- Greenaway, the "inside man," and "my friend." Since the "inside man" was easily identified as the driver of the Brink's van, the reference to "my friend" sharply incriminated Richards, the only other person involved in the case. To further direct the jury to Richards as the unnamed "friend," the prosecutor called Richards' mother to testify that Richards and Greenaway were friends. We thus hold that Bruton, as interpreted in Gray, was violated.

10

Having concluded that a Bruton error occurred, we turn to the impact of the introduction of the confession.

Without question, a Bruton err or is one of constitutional dimension. See United States v. Dispozo Plastics, Inc., 172 F.3d 275, 286, n.10 (3d Cir. 1999). Because of the significance of the error, we will affirm only if we find that the error is harmless beyond a reasonable doubt. United States v. Helbling, 209 F.3d 226, 241 (3d Cir. 2000).

The record, however, indicates that the Bruton issue has not been preserved. When the problem came to light, the District Court questioned counsel on how the matter should be handled. Defense counsel elected to pr oceed without requesting a mistrial. Consequently, a new trial can be awarded only if the introduction of Gr eenaway's statement constitutes plain error.

Fed. R. Crim. P. 52(b) provides: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the Court." This Rule delineating the plain error exception is, however, used "sparingly." See United States v. Frady , 456 U.S. 152, 163 n.14 (1982). In United States v. Young , 470 U.S. 1, 15 (1985), the Supreme Court authorized the courts of appeals to correct only particularly egregious err ors, those that "seriously affect the fairness, integrity or public reputation of judicial proceedings." Id. at 15 (quoting United States v. Atkinson, 297 U.S. 151, 163 (1936)). Only when a miscarriage of justice would result should we r eview under Rule 52(b). Frady, 456 U.S. at 165 n.14.

When reviewing for plain error, we consider, on a case-by-case basis, "the obviousness of the err or, the significance of the interest protected by the rule that was violated, the seriousness of the error in the particular case, and the reputation of judicial proceedings if the error stands uncorrected. . . ." United States v. Thame, 846 F.2d 200, 205 (3d Cir. 1988). The definitive goal is the prevention of manifest injustice. Commonwealth of the Virgin Islands v. Smith, 949 F .2d 677, 681 (3d Cir. 1991).

Admission of a co-defendant's confession can unquestionably jeopardize the fundamental fair ness of a criminal trial; an error embroiling the Sixth Amendment

11

right to confront witnesses rates high on the significance scale. The statement in this case, however, was not sufficiently egregious to requir e a mistrial because the error was not particularly obvious nor was it serious given the other evidence of Richards' guilt. The cr edible testimony of Stevens, the co-conspirator and driver of the Brink's van, independently identified Richards as the participant in the robbery who handled the gun and harmed the Brink's messenger. Stevens also testified that he planned the robbery with Richards for two weeks and that, after the robbery, Richards met with him and told him where to pick up his share of the robbery proceeds.

Additionally, given the District Court's attempt to cure the problem by asking the attorneys how they wished to proceed, there is no indication that the r eputation of the judicial proceedings was tarnished by admission of the evidence.

Considering all these factors, we hold that a manifest injustice did not occur by the Bruton err or and that the admission of the co-defendant's statement was not so prejudicial as to constitute plain error .

III.

Defense counsel apparently assumed that the FBI agent's discussion of Greenaway's statement at trial would not implicate Richards by name. That hope was dashed when Special Agent Harker revealed that Greenaway had indeed mentioned Richards as the person who planned the robbery.

In addition to the Bruton problems raised by the reference to Richards in Greenaway's undisclosed oral statement, Richards contends that the gover nment violated the Jencks Act, 18 U.S.C. S 3500, in failing to disclose Special Agent Harker's complete report r ecounting Greenaway's oral statement.

18 U.S.C. S 3500 provides, in relevant part:

> S 3500. Demands for production of statements and reports of witnesses

12

> (b) After a witness called by the United States has
> testified on direct examination, the court shall, on
> motion of the defendant, order the United States to
> produce any statement . . . of the witness in the
> possession of the United States which relates to the
> subject matter as to which the witness has testified. If
> the entire contents of any such statement r elate to the
> subject matter of the testimony of the witness, the
> court shall order it to be delivered dir ectly to the
> defendant for his examination and use.

18 U.S.C. S 3500(b) (1957).

It is obvious that a Jencks Act violation occurr ed and
that the government's failure to tur n over the material
resulted in the Bruton error . Once again, however, defense
counsel did not make a motion for a mistrial and agr eed to
proceed with the trial. We, ther efore, are restricted to plain
error review.

The same concerns discussed under the Bruton issue --
the significance of the right invoked, the seriousness and
obviousness of the error, and the r eputation of the judicial
proceedings are considered in r eviewing the consequences
of the Jencks Act violation. Our plain error analysis of the
Bruton issue mirrors the reasoning applicable here. A
significant interest was implicated in that the Jencks Act
violation caused the Bruton violation. The obviousness, as
discussed, is questionable because the material was
deliberately withheld to avoid the Bruton pr oblem. The
seriousness also was minimal given the separate r eliable
evidence of Richards' guilt. Factoring in the absence of
damage to the fairness of the judicial pr oceedings, we
conclude that no manifest injustice occurred by the
evidentiary violation.

IV.

Two motions for a new trial based on juror misconduct
were filed following the verdict. Thefirst, filed three months
after trial, was supported by an affidavit fr om an alternate
juror who allegedly witnessed misconduct committed by
two other jurors while the trial was pr ogressing. The basis
of the motion was that the alternate jur or overheard two

13

jurors comment in the presence of other jurors and prior to the close of the evidence that they believed Richards was guilty. The second motion was filed by Richards pro se and concerned statements made by a potential juror who was eventually seated. During voir dire, this juror indicated a familiarity with the government's chief witness, Ignatius Stevens. The District Court denied the motion regarding intra-jury influence, by relying on Fed. R. Evid. 606(b) which prevents inquiry by a court to a jury by asking the effect of information on its verdict.[2]

The District Court correctly denied the motion. First, a Fed R. Crim. P. Rule 33 motion for a new trial based on juror misconduct requires that the defendant establish, as a preliminary matter, that the evidence is newly discovered and that the defendant's failure to discover the information during the trial was not a result of lack of diligence. The affidavit by the alternate juror was not presented until three months after the trial and was vague as to why the disclosure of improper jury influence was untimely.[3] While the defense asserts that Joseph did not alert the defense before that time, that does not suffice to cloak the information as "newly discovered." If the juror had come forward prior to deliberation, the District Court could have held a hearing on the possible presence of improper intra-

_____

2. The Rule reads:

> (b) Inquiry into validity of verdict or indictment.

> Upon an inquiry into the validity of a verdict . . ., a juror may not
> testify as to any matter or statement occurring during the course of
> the jury's deliberations or to the effect of anything upon that or any
> other juror's mind or emotions as influencing the juror to assent to
> or dissent from the verdict . . . or concerning the juror's mental
> processes in connection therewith, except that a juror may testify on
> the question whether extraneous prejudicial information was
> improperly brought to the jury's attention or whether any outside
> influence was improperly brought to bear upon any juror. Nor may
> a juror's affidavit or evidence of any statement by the juror
> concerning a matter about which the juror would be precluded from
> testifying be received for these purposes.

3. The affidavit was also unclear as to why Joseph believed that there was a prejudicial effect upon those jurors who heard the statements of the two jurors concerning their premature determination of guilt.

jury prejudice. Evaluating evidence of misconduct occurring three months after the fact, however, would require the District Court to interview the jurors in contravention of Rule 606(b). Although the statements by the jurors occurred prior to deliberation, the jurors would necessarily be queried as to their thought process to determine whether or not the premature statements affected their verdict. Therefore, inquiry as to the statements of these jurors would be prohibited under the rule. It was not an abuse of discretion in the District Court's failure to grant a new trial based on this allegation of intra-jury influence. See United States v. Gilsenan, 949 F.2d 90, 97 (3d Cir. 1991) ("Of course, under Fed. R. Evid. 606(b), a hearing could not be held for the court to ask the jury the effect of the information on its verdict").

The second motion for a new trial based on juror misconduct alleged that the jury foreman was biased because he was a friend of the government's witness, Ignatius Stevens, and Stevens' family. To order a new trial because of a juror's failure to disclose information at voir dire, requires the complaining party to show that a juror "failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for challenge for cause." McDonough Power Equipment, Inc. v. Greenwood, 464 U.S. 548, 556 (1984). The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can be said to affect the fairness of a trial.

The District Court reviewed the transcript of the voir dire of the juror in question and determined that the juror did not withhold any information. The juror stated he knew the government's witness but that he would nonetheless be fair and impartial and judge the case strictly on the evidence. The District Court noted that defense counsel asked questions of the prospective juror and did not challenge the juror for cause or ask that the juror be stricken.

Therefore, the District Court did not abuse its discretion in denying the appellant's motion for a new trial based on the misconduct of this juror.

15

V.

For the reasons stated above, we will affir m the judgment of sentence.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit

16