PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 08-1536
_____

ANGEL PABON,
                                        Appellant

v.

SUPERINTENDENT S.C.I. MAHANOY;
THE DISTRICT ATTORNEY
OF THE COUNTY OF PHILADELPHIA; THE
ATTORNEY GENERAL
OF THE STATE OF PENNSYLVANIA
_____

On Appeal from the United States District Court
For the Eastern District of Pennsylvania
(D.C. Civil Action No. 07-cv-04199)
District Judge:  Honorable Eduardo C. Robreno
_____

Argued September 23, 2010
_____

Before:  MCKEE, Chief Judge, AMBRO
and CHAGARES, Circuit Judges

(Opinion filed:  July 12, 2011)

Elayne C. Bryn, Esquire (Argued)
1500 John F. Kennedy Boulevard
Suite 1230
Philadelphia, PA  19102

Counsel for Appellant

Thomas W. Dolgenos, Esquire
Anne Palmer, Esquire (Argued)
Office of the District Attorney
Three South Penn Square
Philadelphia, PA  19107

Counsel for Appellees

_____

OPINION OF THE COURT
_____

AMBRO, Circuit Judge

## I.  OVERVIEW

Angel Pabon appeals the District Court's dismissal of his *pro se* petition for *habeas corpus* as untimely.  He is serving consecutive life sentences for two related murder convictions in Pennsylvania state court.  He concedes that his federal *habeas* petition was not timely under the one-year statute of limitations of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254, but contends that equitable tolling should be granted.

Specifically, Pabon maintains that his inability to speak, read, or write English, coupled with the prison's lack of Spanish-language legal materials and repeated denials of translation assistance, are extraordinary circumstances that prevented him from timely filing his *habeas* petition despite diligent efforts to pursue his federal claims.

The District Court dismissed Pabon's *habeas* petition as untimely and denied equitable tolling. We granted a certificate of appealability ("COA") on that issue. We subsequently issued an order staying oral argument due to a potential defect in our COA, as it had not addressed whether Pabon had made a "substantial showing of the denial of a constitutional right," a jurisdictional prerequisite before a COA may issue. 28 U.S.C. § 2253(c). Our jurisdiction turns on whether the trial court may have committed a Sixth Amendment Confrontation Clause violation under *Bruton v. United States*, 391 U.S. 123 (1968), by allowing a non-testifying codefendant's confession to be admitted into evidence despite its potential to prejudice Pabon's defense.

We conclude that Pabon has made a substantial showing that his Sixth Amendment right to confrontation may have been violated. On the equitable tolling issue, we hold that the facts Pabon alleges regarding his language inability (if true), coupled with the prison system's lack of Spanish-language legal materials or interpreters, would be extraordinary circumstances. We also hold that Pabon exercised reasonable diligence in pursuing his claims. Thus, we reverse the District Court's ruling that Pabon was not reasonably diligent, vacate its order of dismissal, and remand for an evidentiary hearing on the factual issue of whether Pabon faced the extraordinary circumstances he claims.

## II. BACKGROUND

### A. The Crime

The back-story begins with Elias Pagan, a drug dealer who in 1997 controlled the corner of Eighth and Birch Streets in Philadelphia. Six men who worked for Pagan were involved in the crime at issue or the subsequent trial: Carlos Robles ("Guatauba"), Arisbel Ortiz, George Roman, José DeJesus, Jonathan Hernandez, and the petitioner, Pabon. Aileen Centeno, Pagan's common-law wife, lived with him and knew these men.

On March 18, 1997, Felix Vargas, a member of a rival drug group, shot and injured Guatauba, who vowed to kill Vargas. Elias Pagan witnessed the shooting and told Guatauba that he would pay him if he killed Vargas. On May 30, 1997, Guatauba, Ortiz, Roman, Hernandez, DeJesus, Pabon and Centeno were present at Pagan's home when plans were made to kill Vargas later that night. Around 10:30 p.m., Ortiz reported to Pagan that he had found Vargas, and Pagan told Ortiz to come to Pagan's house with his car. At the house, Pagan provided the men with guns and black ski masks to wear during the planned shooting.[1] Pagan distributed three weapons: AK-47 rifles for Guatauba and DeJesus, and a handgun for Hernandez. Pabon was not provided a weapon. His confession, later taken by Philadelphia police, states that he already possessed a 9mm handgun that he used in the shooting.

---

[1] Pabon is the only member of the group that was not alleged to have worn a mask.

4

After leaving Pagan's house, Ortiz drove his car to the intersection of Franklin and Indiana Streets, blocking the parked car in which Vargas was sitting. Guatauba allegedly was in the front passenger seat of Ortiz's car, while DeJesus, Pabon and Hernandez were in the back seat. Wearing their ski masks, Guatauba and two or three other men[2] got out of Ortiz's car and started shooting at Vargas. He was killed immediately and a bystander, Elizabeth Carrisquilla, was also fatally shot. Two other female bystanders, both on Franklin Street, were shot but survived their injuries.

At trial, a ballistics expert testified that there were five firearms involved in the attack: two AK-47s, two 9mm semi-automatic handguns, and one .45 caliber handgun. Prosecutors contended that the assailants used four of those guns. The fifth gun, one of the two 9mm handguns, was used to shoot at the assailants by an unknown person who was never identified. A shot from that fifth gun injured Ortiz, who drove away with some of the other shooters, purportedly leaving Pabon and the other remaining shooter behind to flee on foot.

Back at Pagan's house on Birch Street, Pagan told Centeno to give two bundles of $2,500 each to Guatauba in payment for the murder. Guatauba kept one bundle and gave the other to DeJesus. A few days later, Pabon went with Pagan and Centeno and their kids, along with Hernandez and Roman, to Wildwood, New Jersey, for one week. On

---

[2] There was confusion at trial regarding how many shooters there were. Witnesses saw three shooters, all wearing masks. However, the prosecution alleged that there were four shooters, one of whom was not wearing a mask (Pabon).

5

returning to Philadelphia, Pabon was shot in an unrelated incident. After being released from the hospital, he stayed with Pagan for a few days and then went to his home town in Puerto Rico.

Police arrested Pabon in Puerto Rico on charges related to the murders of Vargas and the bystander, Carrisquilla, and read him his *Miranda* rights in Spanish. After his extradition to Philadelphia, Philadelphia Police interrogated him in Spanish.[3] Pabon ultimately gave a confession, conducted in Spanish but translated into English by Detective Perez, in which he admitted to dealing drugs and to being one of the shooters in the attack on Vargas.

### B. The Structure of Pabon's Joint Trial

The Philadelphia DA's Office, on behalf of the Commonwealth of Pennsylvania, prosecuted Pabon jointly with four codefendants for the murders of Vargas and Carrisquilla. His codefendants were: (1) Pagan, alleged to have planned and paid for the killing but not to have been one of the shooters; (2) Centeno, Pagan's common-law wife who the DA claimed was involved in the conspiracy to murder Vargas; (3) DeJesus, an alleged shooter; and (4) Hernandez, an alleged shooter.

---

[3] Pabon has maintained from the time of his arrest that he reads, writes, and understands only Spanish. Detective Carlos Perez (who speaks Spanish) asked Pabon "[D]o you read, write and understand English?" Pabon's answer was "no." Detective Perez then questioned Pabon in Spanish and answers were recorded by Detective John McDermott in English.

Guatauba, also believed to be one of the shooters, was not apprehended by authorities at the time of trial. Ortiz, the purported driver, accepted a plea deal to avoid the death penalty and testified for the Commonwealth. Roman, a member of the drug group who was not involved in the shooting, also testified for the Commonwealth as part of a cooperation agreement regarding a different murder charge.

Judge Jane Greenspan presided over the joint jury trial. Each of the five defendants was represented by his or her own defense counsel. All of the defense attorneys moved for severance, but their motions were denied. The defense attorneys later moved for recusal of Judge Greenspan based on remarks made by her during *voir dire*, but those motions also were denied. Pabon used a court translator for pre-trial hearings and during the trial.

The Commonwealth's decision to introduce confessions given by several of the non-testifying codefendants raised the potential for violations of the Confrontation Clause of the Sixth Amendment of the Constitution. Thus, the trial transcript reflects negotiated, line-by-line edits to these confessions, made by Judge Greenspan in discussion with prosecutors and several of the defense attorneys.

Pabon's court-appointed counsel in this *habeas* appeal points to one passage in DeJesus's statement as a *Bruton* violation. The relevant portion of his statement reads:

> Question: José, is there anything you would like to add to your statement? Answer, Yeah. I know that I didn't shoot the girl who got

7

killed. *Another should be arrested for this. He paid it off.* He even gave me the Grand National for helping to do this besides the money that Guatauba paid me.

(N.T. 8/2/99: 44) (emphasis added). The statement referred to Pagan, who employed the other men and was alleged to have paid for the killings. Pagan's attorney objected, asking that the statement be limited to "I know that I didn't shoot the girl who got killed" to avoid a violation of his client's Sixth Amendment rights. The Commonwealth argued that the statement should not be redacted because it did not name Pagan explicitly. Ultimately, his attorney and the DA agreed to limit the statement to "I know that I didn't shoot the girl who got killed. Another should be arrested for this." Pabon's claim that this redacted statement, in the context of the trial, violated his Confrontation Clause rights is discussed in part III.B below.

### C. Evidence Admitted at Trial

In addition to Pabon and DeJesus's confessions, several of Pabon's codefendants gave statements to the police that were introduced at trial. Pagan's initial statement to the police implicated Guatauba, Hernandez, DeJesus and Ortiz in the murder, but did not implicate Pabon. However, Roman, who was not a codefendant but was part of the drug group, testified at trial that Pabon was involved in the conspiracy to kill Vargas, participated in the shooting, and fled Philadelphia. Ortiz, the driver, testified that he drove Pabon to the shooting, but he did not know if all of the men fired weapons when they got out of his car. Roman and Ortiz's

8

testimony both conflicted with their past statements to the police.[4]

Eyewitnesses at the scene saw a car fitting the description of Ortiz's car. They saw three males get out of the car, one from the driver's side and two from the passenger's side. All three were wearing black clothes and face masks.[5] No eyewitness placed Pabon at the scene of the crime. Eyewitnesses testified that on returning to Birch Street after the murder, three males—identified as Ortiz, Hernandez, and Guatauba—got out of the car. Another witness testified that she saw Pagan, Centeno, Hernandez, and Guatauba celebrating after the shooting, but did not see Pabon. One witness testified about Pabon's involvement in drug dealing but did not link him to the shooting.

Pabon's confession was the Commonwealth's strongest evidence against him at trial. In his statement to Philadelphia police, he admitted to dealing drugs, having a 9mm handgun for protection, and participating in the

_____

[4] Like Pagan, Roman did not implicate Pabon in his initial statement to the police, although he did implicate Guatauba, DeJesus, Hernandez, and Pagan in the shooting. Roman later testified against Pabon after taking a plea deal regarding a different homicide. Ortiz, who also pled guilty to avoid the death penalty, had previously stated that Guatauba and DeJesus got out of the car and shot Vargas, making no mention of Pabon.

[5] The prosecution's theory was that a fourth man (Pabon) got out of the car but did so after the witnesses had ducked for cover. They also argued that Ortiz, the driver, never had a gun and thus it was likely that he did not get out of the car.

shooting. It also states: "While I was shooting at [Vargas], I heard [Ortiz] holler I am shot. I look at [Ortiz]. He was holding his head. The way his car was parked, I knew the shot that hit [Ortiz] came from Franklin Street, so I started firing in that direction."

At trial, Pabon attempted to repudiate his confession. He presented testimony from a forensic document examiner that the signature on his confession was unlikely his own. Pabon also argued that there was no new information provided in his statement that the police did not already know. Additionally, he pointed out that questions commonly asked in such interviews, to which the police would not have known the answers, were not asked in Pabon's interrogation.[6] In rebuttal, however, the DA presented its own document examiner who testified that the signature on the confession was likely Pabon's. During deliberations, the jury requested to see, in their words, Pabon's "alleged confession." Judge Greenspan informed them they could only have it read to them and see only the signatures.[7]

---

[6] For example, the question "what was the last grade you completed" appeared in DeJesus's confession, but not Pabon's.

[7] Pabon's confession and the testimony of the two co-conspirators who became state's witnesses, Roman and Ortiz, were the primary evidence that put Pabon at the scene of the crime. The DA's limited physical evidence consisted of Pabon's fingerprints on the outside of Ortiz's car. The DA argued that Pabon's own confession explains why eyewitnesses did not see him after the crime: after they killed Vargas, it states, "[Ortiz] then took off in his car down

### D. Pabon's Conviction and State Court Appeals

At trial, the jury found Pabon guilty on all counts but could not agree on a sentence. Judge Greenspan imposed two consecutive life sentences for the murders of Vargas and Carisquilla, six to 20 years for conspiracy, concurrent terms of five to 20 years for each aggravated assault conviction, one to two years for possessing an instrument of crime, and one to two years for reckless endangerment.

Pabon's appeal to the Superior Court of Pennsylvania raised six substantive issues, including the *Bruton* issue into which we now make a threshold inquiry. The Superior Court adopted an opinion written by Judge Greenspan as its own and affirmed Pabon's convictions. *Commonwealth v. Pabon*, 768 A.2d 886 (Pa. Super. 2002). The Pennsylvania Supreme Court then denied Pabon's petition for allowance of appeal.

Pabon timely filed a *pro se* petition pursuant to the Post Conviction Relief Act ("PCRA"). Sondra Rodrigues was appointed counsel and filed an amended petition and memorandum of law. The PCRA Court, in an opinion written by Judge Greenspan, dismissed the petition on the merits without a hearing.

Pabon appealed to the Pennsylvania Superior Court, which affirmed the PCRA Court's dismissal in an unpublished decision. The Pennsylvania Supreme Court again denied allowance of appeal. Pabon's subsequent

---

Indiana [Street] with two guys, then I ran. We went to Birch Street." It also stated that he changed his clothes in an abandoned house down the street and did not return to the area.

11

petition for a writ of *certiorari* was denied by the United States Supreme Court.

### E. Pabon's *Pro Se Habeas* Petition in the Eastern District of Pennsylvania

Pabon filed a *pro se* petition for *habeas corpus* with the District Court for the Eastern District of Pennsylvania on September 20, 2007 and it was received by the Court on October 5, 2007.[8] The District Court referred the matter to a Magistrate Judge for a Report and Recommendation ("R&R"). It concluded that Pabon's petition was filed ten months after AEDPA's one-year statutory deadline and was therefore time-barred under 28 U.S.C. § 2244. The R&R also concluded that there was no basis for equitable tolling of the limitations period.

Pabon filed hand-written objections to the R&R, arguing that he was entitled to have the time for filing equitably tolled because he does not read, write or speak English and he was repeatedly denied access to Spanish language materials or a translator while in prison. The Court overruled Pabon's objections, adopted the R&R, and dismissed the *habeas* petition as untimely. Pabon filed a timely notice of appeal in our Court and, subsequently, an application for a COA.

We granted the COA on "whether the habeas petition was timely filed under 28 U.S.C. § 2244(d), including the

---

[8] The federal "prisoner mailbox rule" provides that a document is deemed filed on the date it is given to prison officials for mailing. *See Burns v. Morton*, 134 F.3d 109, 113 (3d Cir. 1998).

question whether there is a basis for equitably tolling the limitations period." We later issued an order staying oral argument, however, pending resolution of a possible jurisdictional defect in the COA. The order directed the parties to brief whether Pabon had made a substantial showing of the denial of a constitutional right as required by 28 U.S.C. § 2253(c).

That jurisdictional issue and Pabon's equitable tolling claim are now before us. We conclude that Pabon has made a substantial showing of the denial of a constitutional right based on the alleged *Bruton* violation. Pabon's codefendant DeJesus's redacted confession, when combined with Pabon's own confession and the limited number of codefendants allegedly involved in the shooting, may have created a damaging inference that DeJesus was accusing Pabon of being a shooter in the crime and violated Pabon's Sixth Amendment right to confront witnesses testifying against him.

Further, we hold that Pabon is entitled to an evidentiary hearing on his equitable tolling claim. The District Court misinterpreted the evidence before it, stating that Pabon had access to a Spanish speaking attorney when in fact he did not. Pabon's claim that he does not speak, read, or write in English exceeds the initial showing of extraordinary circumstances required by two other Courts of Appeals. *See Diaz v. Kelly*, 515 F.3d 149 (2d Cir. 2008), and *Mendoza v. Carey*, 449 F.3d 1065 (9th Cir. 2006). He has also shown a significant degree of due diligence—including reaching out to an attorney he thought spoke Spanish (who did not) and requesting translation assistance multiple times despite the prison's repeated denials. While there is not enough evidence in the record to determine whether Pabon's language

13

deficiency actually caused the delay in bringing his *habeas* claim, an evidentiary hearing is warranted.

## III. JURISDICTION

### A. Standard of Review

Before a circuit court may rule on an appeal from a district court, a state prisoner seeking federal *habeas corpus* relief must obtain a COA as a "jurisdictional pre-requisite." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (citing 28 U.S.C. § 2253(c)(1)). *Slack v. McDaniel*, interpreting § 2253(c), clarifies that when a district court denies a *habeas* petition on procedural grounds without reaching the merits of the underlying constitutional claim, as here, a COA may issue only if the petitioner shows that: (1) "jurists of reason would find it debatable whether the district court was correct in its procedural ruling;" and (2) "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right." 529 U.S. 473, 478 (2000).

An appellate court's "COA determination under § 2253(c) requires an overview of the claims in the habeas petition and a general assessment of their merits." *Miller-El*, 537 U.S. at 336. This is a "limit[ed]," "threshold inquiry" that "does not require full consideration of the factual or legal bases adduced in support of the claims." *Id.*[9] In *Miller-El*,

---

[9] The Commonwealth argues that we should use the AEDPA standard for deciding the merits of *habeas* claims brought by state prisoners in our COA determination. *See* 28 U.S.C. § 2254(d) (claims "adjudicated on the merits in State court" must have "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established

14

the Supreme Court "reiterate[d] that a prisoner seeking a COA need only demonstrate 'a substantial showing of the denial of a constitutional right.'" *Id.* at 327 (citing 28 U.S.C. § 2253(c)(2)). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Id.* (citing *Slack*, 529 U.S. at 484). While a state prisoner must show "'something more than the absence of frivolity' or the existence of mere 'good faith' on his or her part," he or she is not required "to prove, before the issuance of a COA, that some jurists would grant the petition for habeas corpus. Indeed, a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." *Id.* at 338 (internal citation omitted).

---

Federal law" for relief to be granted). This attempt to raise our standard of review at the COA stage is precisely what the Supreme Court rejected in *Miller-El*. It noted that the Fifth Circuit Court had used "too demanding a standard on more than one level." 537 U.S. at 341. "It was incorrect for the Court of Appeals" to import the standard from § 2254(d)(2), as it "applies to the granting of habeas relief rather than to the granting of a COA." *Id.* at 341-42. It was also "incorrect for an even more fundamental reason. Before the issuance of a COA, the Court of Appeals had no jurisdiction to resolve the merits of petitioner's constitutional claims . . . . Deciding the substance of an appeal in what should only be a threshold inquiry undermines the concept of a COA. The question is the debatability of the underlying constitution claim, not the resolution of that debate." *Id.* at 342.

15

We determined in our initial COA that reasonable jurists could dispute the District Court's dismissal of Pabon's *habeas* petition as untimely filed, also noting that the Second and Ninth Circuit Courts have concluded that there may be a basis for equitably tolling AEDPA's limitations period due to severe language barriers. *See Diaz*, 515 F.3d 149; *Mendoza*, 449 F.3d 1065. We now decide that the second jurisdictional requirement, a substantial showing of the denial of a constitutional right, has been met.

### B. Pabon's Confrontation Clause Claim

Pabon claims that the introduction at trial of the confession of DeJesus, Pabon's non-testifying codefendant, violated his Sixth Amendment Confrontation Clause right under *Bruton*. To resolve whether this claim is debatable, we make a threshold inquiry regarding the application of *Bruton* and its progeny to Pabon's trial and conviction. *Miller-El*, 537 U.S. at 338.

#### 1. *Bruton* and Progeny

Trials with multiple defendants create opportunities for violations of the Sixth Amendment right of cross-examination. *Bruton* held that, in a joint trial, a defendant's right under the Confrontation Clause of the Sixth Amendment is violated by introducing a non-testifying codefendant's confession that implicates the defendant as a participant in the crime. Such statements violate the Sixth Amendment even when the jury is explicitly instructed that the testimony at issue is only to be considered as evidence against the

16

codefendant.[10]  This is because jurors in joint trials cannot be expected to "perform the overwhelming task of considering" a codefendant's confession "in determining the guilt or innocence of the declarant and then of ignoring it in determining the guilt or innocence of any codefendants . . . ." *Bruton*, 391 U.S. at 131.[11]  In these circumstances, jury instructions are "intrinsically ineffective" because the inadmissible confession "cannot be wiped from the brains of the jurors." *Id.* at 129.

The Supreme Court elaborated on *Bruton*'s core holding in a case issued the same day, *Cruz v. New York*, 481 U.S. 186, 194 (1987).  When a defendant's confession substantially "interlocks" with the non-testifying codefendant's confession, this exacerbates the potential for a *Bruton* violation rather than rectifying it.  *Id.* at 192.  This is because it is *not* the reliability of the codefendant's confession that is at issue in *Bruton* situations, but the likelihood that the jury is not able to disregard it.  *Id.* at 192-93.  The more "interlocking" the codefendant's confession,

---

[10] "Ordinarily, a witness whose testimony is introduced at a joint trial is not considered to be a witness 'against' a defendant if the jury is instructed to consider that testimony only against a codefendant."  *Richardson v. Marsh*, 481 U.S. 200, 206 (1987).  This is based on the "assumption . . . that jurors follow their instructions."  *Id.*  *Bruton* provides a narrow exception to that assumption.

[11] As Justice Stewart wrote in his oft-quoted concurrence in *Bruton*, those statements "are at once so damaging, so suspect, and yet so difficult to discount, that jurors cannot be trusted to give such evidence the minimal weight it logically deserves."  *Id.* at 138.

the less likely jurors will be capable of putting it out of their minds in deciding the defendant's guilt or innocence. *Id.* Thus, while a "codefendant's confession will be relatively harmless if the incriminating story it tells is different from that which the defendant himself is alleged to have told, [it would be] enormously damaging if it confirms, in all essential respects, the defendant's alleged confession." *Id.* at 192. The damage to the defendant might be less "devastating" "if [he] were *standing by* his confession . . . ." *Id.* (emphasis in original). However, "in the real world of criminal litigation, [when] the defendant is seeking to *avoid* his confession," the damage is significant, like that in *Bruton*. *Id.* (emphasis in original).

Two subsequent cases addressed the thorny issue of redacted statements of non-testifying codefendants. In *Richardson v. Marsh*, the Court held that when "any reference to [the defendant's] existence" has been removed and the confession "bec[omes incriminating] only when linked with evidence introduced later at trial," limiting instructions may cure what would otherwise be a *Bruton* violation. 481 U.S. 200, 211, 208 (1987). While the testimony in *Bruton* directly named the defendant, in *Richardson* "the confession was not incriminating on its face, and became so only when linked with" the defendant's testimony. *Id.* at 208. The Court noted that "[w]here the necessity of such linkage is involved, it is a less valid generalization that the jury will not likely obey the instruction to disregard the evidence." *Id.*

However, the distinction between directly naming a codefendant and indirect linkage is not rigid. Even redacted confessions that remove the defendant's name completely, using a blank space or neutral pronoun instead, may sometimes violate *Bruton*. *Gray v. Maryland*, 523 U.S. 189

18

(1998). "Redactions that simply replace a name with an obvious blank space or a word such as 'deleted' or a symbol or other similarly obvious indications of alteration . . . so closely resemble *Bruton*'s unredacted statements that . . . the law must require the same result." *Id.* at 192. An "obvious deletion" is likely to "call the jurors' attention specifically to the removed name" and may "overemphasize the importance of the confession's accusation." *Id.* at 193. Jury instructions are likely to exacerbate the situation, as the instruction itself "will provide an obvious reason for the [redaction]." *Id.*

In limiting *Richardson*, *Gray* noted that "inference [connecting a codefendant's statement to the defendant] pure and simple cannot make the critical difference" between a *Bruton* violation and permissible testimony under *Richardson*. *Id.* at 195. It is the "*kind* of, not the simple *fact* of, inference" that might lead a jury to infer that testimony incriminated a codefendant in some redacted statements but not others. *Id.* at 196 (emphases in original). Thus, context is relevant to determining whether a *Bruton* violation has occurred, regardless whether the challenged testimony has been redacted or curative instructions given.

For example, our Court held in *Vazquez v. Wilson*, 550 F.3d 270 (3d Cir. 2008), that even when neutral pronoun substitution or its equivalent is used (in that case, "my boy" or "the other guy"), if there is a strong implication that the non-testifying codefendant's confession refers to the defendant, it may still violate *Bruton* despite the substitution and use of jury instructions.[12] In addition, the number of

---

[12] Similarly, in *United States v. Hardwick* we determined that substituting the phrase "others in the van" was not adequately protective, as the phrase clearly referred to only two of the

codefendants that could be implicated in a *Gray* analysis, where redactions or substitutions have been used, is also important. *Compare United States v. Richards*, 241 F.3d 335, 341 (3d Cir. 2001) (*Bruton* violated where only three people were involved in crime) *with Priester v. Vaughn*, 382 F.3d 394, 400-01 (3d Cir. 2004) ("another guy" did not implicate any particular person given that at least 15 persons were involved in the crime, and the placeholder used was "bereft of any innuendo [linking] them" to particular defendants, in contrast to *Richards* in which redactions "were tantamount to an explicit reference" to a codefendant).

Under AEDPA's deferential review standard, our Court in *Vazquez* rejected the Pennsylvania Supreme Court's seeming "bright-line rule that when terms like 'my boy,' the 'other guy,' or the 'other man' are used [as substitutions,] . . . there cannot be a *Bruton* violation." *Vazquez*, 550 F.3d at 281. Rather, as *Vazquez* instructs, using a bright line is "an unreasonable application 'of clearly established Federal law under the decisions of the Supreme Court of the United States'" given the necessity of determining how strongly a codefendant's statement implicates the defendant and the likelihood that it would be disregarded by the jury. *Id.* at 282.

_____

multiple codefendants on trial. 544 F.3d 565, 573 (3d Cir. 2008). We "underscore[d] . . . that the nature of the linkage between the redacted statement and the other evidence in the record is vitally important in determining whether a defendant's Confrontation Clause right has been violated." *Id*.

## 2. DeJesus's Confession in the Context of Pabon's Joint Trial

Pabon's codefendant DeJesus confessed to the crime (from the conspiracy to murder Vargas through payment he received for the murder) in a statement recorded by Detective McDermott. The relevant portion of DeJesus's confession that Detective McDermott read to the jury at trial follows:

> Question, José, when the shootings happened, how many times did you shoot? Answer, like a good twelve times. I was standing in front of [Vargas]'s car shooting into it.
>
> Question, did you see a female standing near [Vargas]'s car when you were shooting? Answer, yeah. She was on the side of the car. I screamed at her, yo, get the fuck out of here. She moved away, and that is how I know I didn't hit the girl. I am standing real close to [Vargas]'s car, so I know that everything I shot was at [Vargas]. How could I miss, I was so close.
>
> Question, *do you know how the two females who were standing on Franklin Street were shot?* Answer, no, I didn't even see them.

. . .

> Question, José, is there anything you would like to add to your statement? Answer, Yeah. *I know that I didn't shoot the girl who got killed. Another should be arrested for this*.

(N.T. 8/2/99: 42-44) (emphases added).

As noted above, DeJesus's statement initially implicated Pagan. It stated that the person who should be arrested for Carisquilla's shooting should be the person who "paid it off" (*i.e.*, provided money and weapons). (N.T. 8/2/99: 22-23). However, it was truncated to stop at "another should be arrested for this," with all further references to Pagan's identity and role deleted, as Pagan's counsel requested because of his own client's *Bruton* rights. (N.T. 8/2/99: 1-33). The prosecution, defense counsel, and trial court were involved in redacting DeJesus's statement. Judge Greenspan instructed the jury that DeJesus's confession could only be used as evidence against him, not any of his codefendants. (N.T. 8/2/99: 38-39). She repeated this caution at the end of trial in regard to Pabon in particular.

Though DeJesus's confession did not identify Pabon by name, he argues that the use of "another" (in the statement "[a]nother should be arrested for this") was an "unnatural locution" that revealed reference to a codefendant's participation in the shooting. *See Gray*, 523 U.S. at 192 ("obvious indications of alteration" may cause a *Bruton* violation even in a redacted statement). He claims that DeJesus's confession would have implicated *Pagan*, had it

22

not been truncated, but was altered to implicate *Pabon* (or Hernandez or Gautauba) as read to the jury at trial.

In context, DeJesus's statement that "another" should be arrested for Carrisquilla's death does seem to refer to "another" of the alleged shooters.[13] It is in a passage of DeJesus's confession discussing how the shooting occurred, making the natural inference from the cropped statement that DeJesus was implicating another shooter. Of the five codefendants, two were not alleged to have been shooters, Pagan and Centeno. That leaves only Pabon, Hernandez, and Guatauba (with DeJesus the fourth alleged shooter) as the person referred to as "another." If the jury credited DeJesus's confession that he shot Vargas but "another" should be arrested for shooting Carisquilla, Pabon and Hernandez are the only two codefendants to whom he plausibly could have referred in this passage of his confession (three persons in all could have been referenced, but one was not a codefendant[14]). While this is not so clear-cut a situation that only one defendant is implicated by a codefendant's statement, it is also a far cry from the situation in *Priester*, for example, in which 15 codefendants were all equally implicated. 382 F.3d at 401. Here, because one of three persons was implicated by the statement, it is possible that attempting to avoid a *Bruton* violation for one codefendant may have created one for two

---

[13] We note that, even were this an "unnatural locution," "another" was the word DeJesus used. It is the context, and the truncation of DeJesus's explanation, that implicates Pabon (or the other alleged shooters) rather than Pagan.

[14] Guatauba was not one of the codefendants, as he had not been apprehended at the time of trial. However, he was referenced at trial as an alleged shooter.

of the others.[15]

In addition, as noted above, Pabon allegedly confessed to shooting toward "Franklin Street," the street from which shots were fired at Ortiz. (N.T. 7/30/99: 64). This increases the likelihood that DeJesus's statement regarding the shooting of "two females who were standing on Franklin Street" was particularly damaging to Pabon (rather than Hernandez or Guatauba, the other alleged shooters). Pabon claims that his challenged confession "is cumulative to the harm suffered . . . because of the admission of the DeJesus statement . . . ." Pabon Br. 22. The potential corroboration of Pabon's confession by DeJesus's does raise flags under *Cruz*. That is, the "interlocking" nature of these two confessions makes it less likely, not more, that curative instructions would solve the *Bruton* problem. Reinforcing this point, Pabon also argues that the prosecutor's closing argument to the jury contended that Pabon and DeJesus's confessions corroborated each other. (N.T. 8/4/99: 94). In these ways, DeJesus's confession may have prejudiced Pabon by increasing the likelihood that the jury would believe he was one of the shooters.

### 3. Pennsylvania Superior Court's Analysis of Pabon's *Bruton* Claim

The DA asserts that the state trial court reasonably concluded that Pabon's *Bruton* claim "is plainly meritless."

---

[15] This is also not a case in which the statement at issue was scrubbed of *all* reference to codefendants. As in *Gray*, the "statement . . . obviously refer[s] directly to someone . . . ." 523 U.S. at 196.

Supp. Br. for Appellees 28. As noted, however, in *Vazquez* we rejected explicitly the bright-line approach taken by the Pennsylvania Supreme Court, under which a substitution of a pronoun for a name is adequate provided no specific name was used and limiting instructions were given. *Vazquez*, 550 F.3d at 282. That same flawed, bright-line approach was applied in deciding Pabon's direct appeal. This implies that Pabon's *Bruton* claim was decided under Pennsylvania case law that is an "unreasonable application of Federal law." *Id*.

In addition, Judge Greenspan repeatedly emphasized the "curative" instructions issued at several times during the trial. These instructions, however, are beside the point. The central premise of *Bruton* is that "[l]imiting instructions may not in fact erase the prejudice" created by a codefendant's confession. *Bruton,* 391 U.S. at 132. Moreover, as *Cruz* noted, under *Bruton* it is the "likelihood that the instruction will be disregarded," not the quality of the instruction or its repetition, that is relevant in determining whether a *Bruton* violation has occurred. *Cruz*, 481 U.S. 186. The United States Supreme Court has reaffirmed that instructions can exacerbate the problem jurors face in trying to segregate evidence that is admissible as to one codefendant but not another. *See Gray*, 523 U.S. at 193. Thus, the Court that decided Pabon's direct appeal should have focused on the degree to which DeJesus's confession implicated Pabon and the extent of any resulting prejudice in the particular circumstances of the trial, rather than the quality or number of jury instructions given.

**C. Pabon's *Bruton* Claim is Debatable for the Purposes of a COA**

Under the *Miller-El* standard, Pabon's alleged *Bruton* violation need only be debatable. For the reasons explained above, we conclude that reasonable jurists could debate whether Pabon has a meritorious claim regarding the introduction of DeJesus's confession at their joint trial and that claim deserves developing.[16] *See Miller-El*, 537 U.S. at 327.

**IV. EQUITABLE TOLLING**

**A. The R&R and the District Court's Ruling**

As noted earlier, the District Court adopted the Magistrate Judge's R&R, which denied Pabon's *habeas* petition as untimely. Under AEDPA, a prisoner has one year from the date a state court conviction becomes final, not including the time during which state post-conviction appeals are pending, to file an application for a writ of *habeas corpus*. 28 U.S.C. § 2244(d)(1). Judgment becomes final at "the conclusion of direct review or the expiration of the time for seeking such review." *Id*.

Pabon's conviction became final on August 12, 2002, when the time expired for seeking *certiorari* for direct review

---

[16] We note that Pabon's *pro se habeas* petition raised four claims. Although his appointed counsel deals with only one of those claims (the *Bruton* claim) for COA purposes, that does not foreclose consideration of his other claims in the District Court were Pabon to succeed on his equitable tolling claim.

26

by the United States Supreme Court. *See Kapral v. United States*, 166 F.3d 565, 567 (3d Cir. 1999). About nine months later (May 12, 2003),[17] statutory tolling of the limitations period began when Pabon filed his PCRA petition in the Court of Common Pleas. On August 8, 2006, the Supreme Court of Pennsylvania denied allowance of appeal, ending the statutory tolling period.[18] As about nine months had passed before Pabon filed his PCRA petition, he had three months left before AEDPA's one-year filing deadline. His *habeas* petition was filed on September 20, 2007, well past the one-year mark.

The R&R stated that "Pabon does not allege circumstances which prevent him in some extraordinary way from filing a timely habeas petition." R&R at 7. It also stated that Pabon "fails to allege circumstances indicating that he exercised reasonable diligence." *Id.*

Pabon filed objections (handwritten by a fellow inmate) to the R&R. They were that: (1) timely filing of his *habeas* petition was unlawfully impeded by state action and

---

[17] As with federal law, *see supra* note 8, under Pennsylvania law the "prisoner mailbox rule" provides that prisoner filings are deemed filed on the date they are delivered to authorities for mailing. *See Commonwealth v. Castro*, 766 A.2d 1283, 1287 (Pa. Super. 2001). Pabon's petition appears to have been postmarked on May 12, 2003. *See* Br. for Appellees 7 n.1.

[18] Pabon filed a petition for *certiorari* in the Supreme Court following denial of his PCRA appeal, but statutory tolling did not continue while that petition was pending. *See Lawrence v. Florida*, 549 U.S. 327, 329 (2007).

AEDPA allows a *habeas* petition to be submitted up to one year after an unlawful impediment to filing created by state action has been lifted, *see* § 2244(d)(1)(B), so, he contends, his petition was timely under AEDPA; and/or (2) equitable tolling should apply. As to his second argument, he asserts that he should have been entitled to equitable tolling from September 7, 2006 (the date he initially requested legal assistance from a prison paralegal) to September 20, 2007 (the deemed filing date of his *habeas* petition) due to his inability to read, write, or understand English, the lack of Spanish-language legal materials in the prison's restricted housing unit (the "RHU"), and repeated denials of requests for legal or translation assistance.[19]

The District Court concluded that there was no basis for equitable tolling of the statutory limitations period. In doing so, it did not hold an evidentiary hearing with respect to Pabon's language ability, his access to Spanish-language legal materials in prison, or how he may have been affected by his inability to obtain legal or translation assistance. As noted, Pabon appealed and we granted his application for a COA.

### B. The Standard for Equitable Tolling

In determining whether equitable tolling should be granted, we address two questions: (1) whether the petitioner faced extraordinary circumstances that stood in the way of timely filing; and (2) whether he or she exercised reasonable diligence. *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005); *see also Merritt v. Blaine*, 326 F.3d 157, 168 (3d Cir. 2003)

---

[19] Pabon also objected to the denial of his motion for counsel.

(same). In *Holland v. Florida* the Supreme Court confirmed that equitable tolling may be applied to AEDPA's statutory limitations period. 130 S. Ct. 2549, 2560 (2010).[20]

There are no bright lines in determining whether equitable tolling is warranted in a given case. Rather, the particular circumstances of each petitioner must be taken into account. *Id*. at 2563. As *Holland* explains, while prior decisions provide guidance, rigid reliance on precedent should be avoided. *Id.* In each case, there is a need for "flexibility," "avoiding 'mechanical rules,'" and "awareness . . . that specific circumstances, often hard to predict in advance, could warrant special treatment in an appropriate case." *Id*. (internal citation omitted).[21] In sum, equitable tolling is appropriate when "principles of equity would make the rigid application of a limitation period unfair." *Miller v. N.J. State Dep't of Corr.*, 145 F.3d 616, 618 (3d Cir. 1998); *see also LaCava v. Kyler*, 398 F.3d 271, 275 (3d Cir. 2005).

---

[20] *Holland* confirms our Court's rulings that AEDPA's statute of limitations is subject to equitable tolling. *See, e.g.*, *LaCava v. Kyler*, 398 F.3d 271 (3d Cir. 2005); *Miller v. N.J. State Dep't of Corr.*, 145 F.3d 616 (3d Cir. 1998).

[21] The Commonwealth urges an approach that defies the fundamentals of equity, asking us to conclude that a certain type of circumstance can never be extraordinary. Despite *Holland's* admonition against bright-line rules, the Commonwealth continues to argue that Pabon "has failed to state even potentially extraordinary circumstances," suggesting that similar circumstances as those alleged in *Mendoza* and *Diaz* could *not potentially* be extraordinary. (DA's Rule 28(j) letter at 3). That kind of rigid rule is precisely what *Holland* warns against.

However, courts need to be "sparing in their use of" the doctrine. *Jones v. Morton*, 195 F.3d 153, 159 (3d Cir. 1999).

## C. Equitable Tolling Analysis

### 1. Extraordinary Circumstances

Our Court has not yet addressed whether a language deficiency may constitute an extraordinary circumstance for the purposes of equitable tolling. We find it persuasive that the Second and Ninth Circuit Courts of Appeals have both determined that equitable tolling might be warranted when a non-English speaking petitioner could not comply with AEDPA's statute of limitations because the prison did not provide access to AEDPA-related materials, translation, or legal assistance in his or her language.

In *Mendoza*, the petitioner asserted that he did not speak English and that "the prison law library possessed no Spanish books, no Spanish-English legal dictionaries, and no postings about the AEDPA time limitations in any language." 449 F.3d at 1067. The Ninth Circuit held that the "combination of (1) a prison law library's lack of Spanish-language legal materials, and (2) a petitioner's inability to obtain translation assistance before the one-year deadline, could constitute extraordinary circumstances." *Id.* at 1069. Mendoza's case was remanded for an evidentiary hearing on his equitable tolling claim in light of that holding. *Id.* at 1071.

Pabon has alleged almost identical extraordinary circumstances as the petitioner in *Mendoza* (indeed, Pabon's are perhaps more extraordinary given his confinement in the RHU). In *Mendoza*, the petitioner eventually "found a newly-

arrived, bilingual inmate willing to offer assistance" for a fee, and was able to file a *habeas* petition (though only after the AEDPA deadline had passed). *Id.* at 1069. Again similar to Mendoza, Pabon eventually received help from an English-speaking inmate in filing his *habeas* petition, but after the AEDPA deadline.

Second, in *Diaz*, the Second Circuit adopted a similar approach to that used in *Mendoza*. 515 F.3d at 154 (holding that "English language deficiency can warrant tolling of the AEDPA limitations period"). The petitioners in *Diaz*—Angel Diaz and Yoke Yew Tan—had asserted, respectively, being "'primarily a Spanish speaker'" and having "a lack of 'a working knowledge' of English and 'difficult[y]' in finding interpreters in the Department of Correctional Services." *Id.* at 151-52 (alterations in original). The *Diaz* Court noted that "the proper inquiry is *not how unusual the circumstance* alleged to warrant tolling is among the universe of prisoners," as the State had argued (and the Commonwealth urges in Pabon's appeal), "*but rather how severe an obstacle it is for the prisoner* endeavoring to comply with AEDPA's limitations period." *Id.* at 154 (emphases added). "For the prisoner who cannot read English, the obstacle is undoubtedly serious . . . and can, in some circumstances, justify equitable tolling." *Id.* In that case, however, the petitioners failed on the reasonable diligence prong. Neither had made efforts "to learn of [AEDPA's] requirements within their places of confinement." *Id.*

As these Circuit Courts did in *Mendoza* and *Diaz*, we now hold that inability to read or understand English, combined with denial of access to translation or legal assistance, can constitute extraordinary circumstances that

31

trigger equitable tolling.[22]  In addition, as the *Diaz* Court did, we note that the relevant inquiry is not whether the circumstance alleged to be extraordinary is unique to the petitioner, but how severe an obstacle it creates with respect to meeting AEDPA's one-year deadline.

In light of this holding, we conclude that the District Court erred in rejecting Pabon's claim without an evidentiary hearing.  First, it erred in concluding that Pabon had not explained why his inability to read, speak, or write English caused his inability to timely file his *habeas* petition.  Pabon explained that there were no Spanish-language legal materials, and there was no notice of AEDPA in Spanish, in the RHU where he was housed for five years.  These facts, he

---

[22] The Commonwealth argues that *Cobas v. Burgess*, 306 F.3d 441 (6th Cir. 2002), supports its position that a language barrier cannot constitute an extraordinary circumstance.  First, as explained above, *Holland* throws into serious doubt the notion that there exist types of circumstances that can *never* be extraordinary, as courts must use a case-by-case analysis rather than bright lines in this inquiry.  130 S.Ct. at 2563.  In any event, *Cobas* did not hold that language barriers can never be "extraordinary" for equitable tolling purposes—it merely concluded that in that case, while the petitioner had alleged an inability to speak or understand English, he appeared to have access to an interpreter, so his language inability had not created a language barrier.  306 F.3d at 444.  Thus, *Cobas* is consistent with the approach we adopt today. *See also Mendoza*, 449 F.3d at 1069-70 (citing *Cobas* to support the holding that language inability, coupled with denial of translation assistance, can constitute an extraordinary circumstance).

argued, coupled with repeated denials of legal or translation assistance from prison officials despite efforts on his part, were "extraordinary circumstances" that prevented him from timely filing his *habeas* petition. *See* Pabon Br. 18-19. He asserted quite clearly that language inability, coupled with denials of assistance, created a barrier to timely filing.

The District Court also assumed that Pabon's potential language barrier was negated by his communication with a "Spanish-speaking attorney." Op. at 2 n.1. We disagree, as the evidence currently before us supports the contrary conclusion—that Pabon continued to face a language barrier until his *habeas* petition was filed, as he had been unable to obtain legal or translation assistance despite continuing efforts. The record also reflects that Pabon required a Spanish-language translator in trial and pre-trial proceedings. A129-130. A Spanish-speaking detective (Detective Perez) testified at trial that he read Pabon his *Miranda* rights in Spanish, questioned him in Spanish, and asked him (in Spanish) whether he reads, writes, or understands English, to which Pabon answered "no." (N.T. 7/30/99: 52-62).[23]

In sum, there is substantial evidence in the record that Pabon may have faced an extraordinary circumstance: he has

---

[23] The Commonwealth argues that Pabon's "proficiency [in English] when he gave his confession and was tried, between 1997 and 1999, are simply immaterial to his proficiency in November 2006, the time of the AEDPA deadline." Br. for Appellees 50 (emphasis omitted). It may be that Pabon's language proficiency has changed while in prison, but that is precisely the type of factual inquiry for which an evidentiary hearing is required.

33

consistently claimed to be a non-English speaker, required a translator in his interactions with police and the court system, lacked access to legal materials or notice of AEDPA in Spanish in the RHU where he was housed for five years, and was repeatedly denied legal materials in Spanish or translation assistance.[24] As the District Court did not hold an evidentiary hearing on this issue, we reverse and remand for it to do so.

---

[24] Although the Commonwealth urges otherwise, Br. for Appellees 43-45, we emphasize that the assistance Pabon eventually received from another inmate does not bar the possibility that he had faced extraordinary circumstances up to that point. To conclude otherwise would yield the perverse result of leaving prisoners at the mercy of fellow inmates. This presents many problems. For example, an inmate who at first might be willing to provide translation or legal help could change his or her mind, being under no obligation to assist fellow inmates, or could be transferred at any time. Moreover, an inmate who understood enough of the petitioner's language to translate a two-paragraph grievance, such as the one prepared for Pabon by José Ortiz, might not have enough language skills (or might not be willing) to help a petitioner decipher federal statutes, let alone prepare an entire petition for *habeas corpus* requiring legal research and a considerable investment of time. For these reasons, we reject the Commonwealth's argument that eventually receiving help from an inmate bars the potential for equitable tolling. We also reject the Commonwealth's conclusory assertion that equitable tolling based on a language barrier is improper because Pabon "commit[ed] crime" in Philadelphia "with considerable speed and ease." *Id.* at 43.

## 2. Reasonable Diligence

Even if a petitioner has faced extraordinary circumstances, he must also "exercise[] reasonable diligence in . . . bringing [the] claims." *Miller,* 145 F.3d at 618-619 (internal quotation marks omitted). The Supreme Court addressed reasonable diligence in *Holland*, explaining that "[t]he diligence required for equitable tolling purposes is 'reasonable diligence,' . . . not 'maximum feasible diligence.'" 130 S.Ct. at 2565 (internal citations omitted). Our Court has established a similar standard. "Due diligence does not require 'the maximum feasible diligence;'" "it does require reasonable diligence in the circumstances." *Schlueter v. Varner,* 384 F.3d 69, 74 (3d Cir. 2004) (internal citations omitted); *see also LaCava*, 398 F.3d at 277.

Here, based on the documents Pabon submitted with his objections to the R&R, we count ten or more efforts where he sought assistance, both before and after the AEDPA deadline. After ascertaining that there were no Spanish-language legal materials in the RHU, Pabon wrote to his PCRA attorney, in Spanish, before October 28, 2004. He wrote a second letter seeking help from that attorney before November 30, 2004. At various times before September 7, 2006, he submitted "numerous written requests" seeking legal materials or assistance within the prison system.[25] While in the RHU, he submitted a letter to the general population law library, with help from an English-speaking inmate,

---

[25] The prison paralegal's denial of Pabon's subsequent request states that he had already submitted "numerous written requests," A-55, and his appeal of that denial also notes that he had submitted prior request slips. A-56.

requesting assistance from the staff paralegal, but was denied assistance on September 19, 2006. On November 6, 2006, Pabon filed an "Official Inmate Grievance," with the assistance of inmate José Ortiz, again requesting access to legal services and stating that he does not speak, read, or write in English.[26] That grievance was denied without explanation.[27] All of these efforts occurred before the AEDPA filing deadline of November 6, 2006.

Pabon's efforts did not stop there. Before December 22, 2006, he again sought help from an attorney. He submitted a second appeal for access to paralegal services before January 23, 2007. On February 4, 2007, he requested the appointment of an Inmate Legal Reference Aide, but never received a response to his request. Thereafter, he found a bilingual inmate who agreed to help him with his *pro se habeas* petition. That petition was signed (and, as noted, delivered to prison officials) on September 20, 2007.

The District Court's conclusion that Pabon did not demonstrate diligence is based, at least in part, on the

---

[26] The grievance explained that "[i]t appears that the paralegal referred to prior request slips <u>written by other inmates</u>, but <u>sent by me</u>, to base her decision in not to help me [sic]." A-56 (emphases in original).

[27] The response to Pabon's Official Inmate Grievance merely states who made the previous decision to deny his request. It does not state why it was denied or review the paralegal's decision in any manner: "It was [the paralegal's] decision that you did not require legal assistance in accordance with DC ADM 007. It is not the decision of the SCI-Mahanoy Library Staff." A-57.

assumption that he had a Spanish-speaking attorney. In its Order dismissing Pabon's *habeas* petition, the Court stated that he "has made no attempt to explain why, in light of the fact that he contacted a Spanish speaking attorney, his petition was close to one year late." Op. at 2 n.1. The record belies that statement. The attorney the Court references seems to be Pabon's post-conviction (PCRA) attorney, who did not speak Spanish. She wrote the following letter to Pabon on October 28, 2004:

> Dear Mr. Pabon:
>
> You have sent a letter to me in Spanish. *I do not understand it.* If you are asking about your appeal, there will not be a decision on it until some time next year (or longer). *You must correspond with me in English in the future if you expect me to comprehend what you are saying.* Thank you.
>
> Sincerely,
>
> Sondra R. Rodrigues, Esq.

A-51 (emphases added).[28]

---

[28] In response to further requests for assistance from Pabon, Ms. Rodrigues later wrote him another letter containing about two paragraphs of broken Spanish and one paragraph in English, again reiterating that she does not speak Spanish and

Thus, unlike the *Diaz* petitioners who had made no efforts to communicate with anyone outside of prison or learn of next steps to pursue their legal claims within their places of confinement, 515 F.3d at 154, Pabon attempted to pursue his claims repeatedly. Moreover, within prison he sought access to legal materials in Spanish or translation assistance, but was denied or left without a response each time he did so. Under these circumstances, we hold that Pabon was reasonably diligent.

Because we hold that language inability, when coupled with lack of translation assistance, may constitute an extraordinary circumstance, and because Pabon was reasonably diligent in pursuing his claims, we conclude that the District Court erred in dismissing Pabon's equitable tolling claim without considering the evidence he offered. The Commonwealth should also have an opportunity to submit evidence in response. Thus, we remand for an evidentiary hearing on the extraordinary circumstances prong of Pabon's equitable tolling claim.

---

attempting to explain that her great-grandparents were from Portugal. A-54. It appears that the District Court did not consider this correspondence regarding Ms. Rodrigues's language abilities (or lack thereof), but instead may have assumed based on her last name that she would have Spanish-language proficiency (as Pabon himself may have done). We see no other basis for the conclusion that Pabon "contacted a Spanish-speaking attorney." Op at 2 n.1.

**D. Timeliness under § 2244(d)(1)(B): "Impediment to Filing"**

AEDPA provides that "a one-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court." 28 U.S.C. § 2244(d)(1). Sub-parts to that section provide four possible starting dates for the tolling period. "The limitation period shall run from the latest" date of those four options. *Id.*

Under § 2244(d)(1)(A), the limitations period runs from "the date on which the judgment became final by the conclusion of direct review of the expiration of the time for seeking review."[29] However, Pabon argued in his application for a COA that § 2244(d)(1)(B) applies. Under it, the limitation period runs from "the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action." § 2244(d)(1)(B). Pabon claims that the Commonwealth's denial of Spanish-language legal assistance or notice of AEDPA in Spanish is an "impediment to filing" within the meaning of § 2244(d)(1)(B). Our Court has not addressed the meaning of "impediment to filing" under § 2244(d)(1)(B). We do not reach the issue here because the impediment Pabon argues prevented him from filing

---

[29] The District Court concluded that the AEDPA limitations period began running for Pabon on the date on which his judgment became final (August 12, 2003). No party disputes that August 12, 2003 is the correct starting date if § 2244(d)(1)(A) is applicable.

remained un-removed: As far as we know, and as Pabon himself argues, at the time that he filed his *habeas* petition he was still denied Spanish-language materials, translation and legal assistance.

## V. CONCLUSION

We hold that language inability, when coupled with denial of legal or translation assistance, can be an extraordinary circumstance for equitable tolling purposes in the *habeas* context. We also hold that Pabon was reasonably diligent in pursuing his claims. Thus, Pabon's equitable tolling claim merits an evidentiary hearing. We thus reverse the District Court's ruling, vacate its order of dismissal, and remand for an evidentiary hearing on the extraordinary circumstances Pabon has alleged in his equitable tolling claim.