**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-2468
_____

VERNON WILLIAMS,
Appellant

v.

LOUIS S. FOLINO; THE ATTORNEY GENERAL
OF THE STATE OF PENNSYLVANIA
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
(D.C. No. 2-12-cv-00008)
District Judge:  Hon. Arthur J. Schwab
_____

Argued May 13, 2014

Before:  SMITH, VANASKIE and SHWARTZ, <u>Circuit Judges</u>.

(Filed: September 2, 2015)

Lisa B. Freeland, Esq. [ARGUED]
Office of Federal Public Defender
1001 Liberty Avenue
1500 Liberty Center
Pittsburgh, PA 15222
        Counsel for Appellant

Kelly D. Tomasic, Esq. [ARGUED]
Keaton Carr, Esq.
Ronald M. Wabby, Jr., Esq.
Allegheny County Office of District Attorney
436 Grant Street
303 Courthouse
Pittsburgh, PA 15219
            Counsel for Appellee

_____

OPINION*
_____

SHWARTZ, Circuit Judge.

Vernon Williams seeks relief pursuant to 28 U.S.C. § 2254 claiming that the

introduction of his codefendant's redacted confession at their joint trial allowed the jury

to infer that the confession referred to him in violation of Bruton v. United States, 391

U.S. 123 (1968). We agree that the admission of the confession violated Williams'

Confrontation Clause rights but conclude that it did not have a substantial and injurious

effect on the verdict. We will therefore affirm.

I

A

Williams and his codefendant, Curtis Mahaffey, were convicted of the 2002

murder of Lanel Buckner. On September 26, 2002, Buckner and others attended a

birthday party at a Pittsburgh bar. Buckner traveled in one car and others traveled via

limousine. On September 27, 2002, at 2:30 a.m., the vehicles parked and Buckner exited

---

*This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

his car and started talking with the limousine passengers. At that point, a man exited a pickup truck parked nearby and shot Buckner several times. The man then returned to the pickup truck and the truck fled. Buckner died of his injuries.

Pittsburgh Police Department Detective Dennis Logan received an anonymous tip about the murder that incriminated Curtis Mahaffey. Logan interviewed Mahaffey, who was being held in jail on unrelated robbery charges, and Mahaffey confessed, implicating himself and Williams.

At trial, Detective Logan testified about Mahaffey's confession without using Williams' name. Instead, he used the phrase "his boy" in place of Williams' name. Logan first testified about Mahaffey's statements about the pickup truck driven to the murder scene and then recounted Mahaffey's statements about the murder. As to the pickup truck, Logan testified in part:

> Mr. Mahaffey said that he and his boy were down on Brighton Road near Dave's Barber Shop at which point they saw this white guy looking to buy some crack. . . . [T]hey made an arrangement whereas [sic] Mr. Mahaffey and his boy would drive around in a white guy's truck for a set period of time. When that time period was up the white guy was to call Mr. Mahaffey on his cell phone . . . and that Mr. Mahaffey and his boy [would] return the truck back to the white guy. . . . [A]fter, shortly after they got the truck the white guy start[ed] calling before the time was even up and for that reason they got into an argument and Mr. Mahaffey said he was not going to return the guy's truck at all. . . . [B]ecause in Mr. Mahaffey's view the white guy kept calling before his time was up, he kept the truck.

App. 715-17.

As to the murder, Logan testified in part:

> Mr. Mahaffey said he was still driving that same grey truck which belonged to the white guy with the crack deal. . . . Mr. Mahaffey said he ran into his boy once again and that he and his boy got into the truck, the grey truck

3

that belonged to the white guy and dr[ove] around, smoking some weed. As Mr. Mahaffey and his boy are driving around he said that they saw the limousine which there was a guy named Burger[1] inside the limousine. Mr. Mahaffey said both him and his boy knew this Burger. . . . [A]s they went the same route as the limousine, the limousine pulled over at some spot at which point Mr. Mahaffey said his boy told him pull over. So Mr. Mahaffey said they drove past the limousine and he pulled over as he was told by his boy. At the same time Mr. Mahaffey said that his boy had a gun . . . . Mr. Mahaffey also said he knew what his boy was about to do with the gun. After Mr. Mahaffey pulled the truck over his boy got out of the . . . truck . . . and walked back to the limousine. Moments later Mr. Mahaffey said he hears four or five gunshots at which point he said he waited in the truck, waited in the truck, waited for his boy to return back. His boy jumped into the . . . truck . . . and the two of them drove off. . . . [H]e knew what his boy was about to do, but in Mr. Mahaffey's view he was afraid of his boy and he stayed and he waited [during the shooting].

App. 717-20.

In addition to Mahaffey's statements, the jury heard from the owner of the pickup truck, Dean Geiger, as well as those who observed the shooting and those who heard about it. Geiger testified that he had loaned his pickup truck to "two guys" in exchange for crack. App. 157. He testified that one of the men was "heavier set" and one was "skinnier," and that the skinnier man's name began with "C" and he drove the truck. App. 161, 191. He testified that the two men did not return his truck and he reported it stolen. Law enforcement showed Geiger a photo array and he identified Mahaffey as being one of the men who took his truck, but he did not identify anyone else. A defense investigator testified that he showed Geiger the same photo array and that Geiger identified the men who took his truck. One of the men Geiger identified was Mahaffey, but the other was not Williams. On cross-examination, Geiger testified that he had been

---

[1] Other testimony established that "Burger" was the nickname of the man whose birthday party was taking place that night. App. 818.

4

drinking the day his truck was taken, and that at the time of trial he did not "really have a clear memory of who was in the truck." App. 211.

Another witness, Willie Olds, testified that he saw Williams shoot Buckner and flee toward the pickup truck. Olds testified that he attended the party on the night of Buckner's murder, that he parked across the street from the limousine, and that he saw someone wearing a hooded sweatshirt fire "four or five shots" at Buckner. App. 656-57, 660. He said that the shooter turned and faced him, and that he recognized the shooter as Williams. Olds acknowledged that he had not told anyone about his identification of Williams until he was "confronted with going to prison," App. 662, but stated that he "was on the run" at the time and did not want to "roll over" on anyone by incriminating them, App. 690.[2]

Tosha Peterson, who also attended the birthday party and who had a daughter by Buckner, and her cousin, Jequetta Bledsoe, both testified that they observed the pickup truck on the night of the murder. Peterson testified that, the night of the murder, a man wearing a hooded sweatshirt (who she claimed at trial that she did not recognize) got out of a pickup truck, which she said Mahaffey was driving, and told her to "tell [her] baby's dad it's on." App. 255-57. She testified that she called Buckner and told him, "[d]on't

---

[2] Olds also testified that he had an agreement with the government to cooperate in this case and to make himself available to federal agents. In exchange, he was permitted to plead guilty with a sentence of time already served plus five years' probation.

go home," App. 259-60, but that she did not tell him who she thought would be awaiting him there.[3]

Bledsoe also testified about the men in the pickup truck she and Peterson encountered. She testified that she recognized the driver of the pickup truck as Mahaffey, but did not recognize the man who got out of the pickup truck and spoke with Peterson. Unlike Peterson, however, Bledsoe testified that Peterson specifically told Buckner "[t]hat Curtis and D-Bo" were the ones waiting for him. App. 289. Bledsoe testified that she did not know who "D-Bo" was, App. 289, but other witnesses testified that this was a nickname for Williams.

Diana Pennybaker testified that she was with Buckner at the birthday party on the night of his murder. She testified that while Buckner's car and the limousine were parked near each other, a pickup truck stopped and two men, one of whom "was just bigger than the other," got out. App. 387-88. She first testified that the shooter, who was wearing a hooded sweatshirt, got out of "the passenger side" and then said he exited from " -- the driver's side, I'm sorry" and fired "twice, maybe three times." App. 388-90. She testified that she was unable to see either man's face and had never met Mahaffey or Williams, but that she believed the shooter was the smaller of the two men.[4]

Joseph Ritter, the limousine driver, testified that he saw someone wearing "a black or a blue hooded sweatshirt" approach the limousine and fire "like five shots into the

---

[3] Peterson made no attempt to talk to the police after Buckner's shooting and testified that she had twice pled guilty to "summary retail theft." App. 261-62.

[4] On cross-examination, Pennybaker testified that she had consumed "a double shot of tequila" on the night of Buckner's murder. App. 393.

6

back of the young man leaning in the car," App. 436-37, but that he did not get a good look at the shooter, although he "assumed [the shooter] was a little bit of a hefty guy, around 200, maybe more," App. 458. Ritter testified that the shooter got into a white pickup truck, although he later testified he was unsure, stating that the night of the murder was "a bit of a blur." App. 454.

During trial, several individuals who had been incarcerated with Williams also testified. David Fitzgerald[5] participated in a taped interview in which he said that Williams had admitted participating in the murder, but at trial, Fitzgerald denied that Williams had ever discussed it, and said that the detectives who interviewed him "suggest[ed]" what he should say. App. 534-35; see App. 536-37. The tape was played at trial. During the taped interview, Fitzgerald said "[Williams] didn't really say how he came in contact with [Buckner]. He just, just said like, I mean he followed him from the club, you know what I mean, he followed him, he laid on him, followed him from the club and once they got to the hood, you know what I mean, then once they got to the hood, you know what I mean, it was over." App. 572. During the interview, Fitzgerald also stated that he had known Williams since childhood, that Williams had discussed Bledsoe's relationship with Buckner, and that Williams believed that Bledsoe had identified him as a murder suspect. The detective who conducted the taped interview

---

[5] Fitzgerald testified that he was in jail at the time of the trial because he had "five open cases against [him]," that he had a prior juvenile adjudication of delinquency for robbery, and that he had pled guilty "to false reports to law enforcement" and "to false identification to law enforcement" in 2001. App. 521-23.

testified that Fitzgerald told her that he was concerned about repercussions from having provided information.

Jeffrey Ketter also interacted with Williams in jail, and testified that he had overheard Williams tell another inmate that he had shot Buckner and when the other inmate asked why Williams shot Buckner multiple times, Ketter "observed the smirk on [Williams'] face." App. 585-86. Ketter also testified that Fitzgerald had told him prior to testifying that Fitzgerald planned "to come up here and just screw up everything because he already talked to [Williams' attorney]."[6] App. 588.

Lance Gardenhire, another inmate, testified that he remembered Ketter and Williams, but that he had never heard Williams discuss why he was in jail or Buckner's murder.[7] He also testified that he had told a detective "that Jeffrey Ketter was a liar," App. 797-99, but acknowledged that the detectives' report did not reflect that statement. He further testified that inmates generally do not openly discuss their cases while in jail, although he acknowledged that he went out of his way to keep to himself.[8]

Only one witness who testified to having attended the party specifically stated that Williams was not the shooter. Dai-Shon Hammond testified that he had witnessed the

---

[6] Ketter testified that he had committed several past offenses, and that the prosecutor had agreed to inform the judges handling his cases that he testified in this case so that he could be released from jail.

[7] Another inmate, Lamont Andrews, also testified that he never heard Williams make any statements about a homicide but also said that he would not have told the detectives that he had heard such statements because he did not want to be "labeled as a snitch." App. 811-14.

[8] On cross-examination, Gardenhire admitted that he had several prior convictions, including one for "false identification to law enforcement," and that Williams' lawyer had represented him for 10 years. App. 803.

8

shooting; he described the shooter as "5'3", 5'9", 150 pounds, thin guy" and testified that the shooter he saw was not Williams. App. 821-824. On cross-examination, Hammond acknowledged that he had not given the detectives a description of the shooter immediately following the shooting, stating that the detectives "didn't ask." App. 827.

On November 26, 2003, the jury convicted Williams of first-degree murder and conspiracy to commit murder. On appeal, Williams claimed, among other things, that the admission of Mahaffey's statement violated the Confrontation Clause. In 2005, the Pennsylvania Superior Court addressed Williams' Confrontation Clause argument, holding that

> using 'boy' to replace [Williams'] name was an acceptable form of redaction and, in combination with a specific cautionary instruction the court gave the jury, was sufficient to protect [Williams'] right to confrontation even though the jury may have inferred, given Ms. Bledsoe's testimony, that [Williams] was the 'boy.'

App. 1054 (footnote omitted). In reaching this conclusion, the Superior Court cited two Pennsylvania Supreme Court cases that held that this type of redaction is acceptable: Commonwealth v. Miller, 819 A.2d 504 (Pa. 2002), and Commonwealth v. Travers, 768 A.2d 845 (Pa. 2001). The Supreme Court of Pennsylvania denied Williams' petition for allowance of appeal on December 7, 2005.

Williams filed a collateral attack pursuant to Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 Pa. Cons. Stat. § 9541 et seq., but did not raise the Confrontation Clause issue. His petition was dismissed, the Superior Court affirmed the dismissal, and the Supreme Court denied leave to appeal.

9

Williams petitioned for federal habeas relief in the United States District Court for the Western District of Pennsylvania based upon his claim that the admission of Mahaffey's redacted confession violated the Confrontation Clause. The petition was referred to a Magistrate Judge for a Report and Recommendation. The Magistrate Judge found that by using the words "his boy," the redaction "merely revealed that [Mahaffey] was not acting independently," and thus the Superior Court's resolution of the Confrontation Clause issue "was not an unreasonable application of Supreme Court precedent." App. 16-17. The District Court adopted the Report and Recommendation, dismissed Williams' petition, and denied a certificate of appealability. This Court granted Williams' request for a certificate of appealability with respect to his Confrontation Clause claim.

B

The District Court had jurisdiction under 28 U.S.C. § 2254(a). We have jurisdiction under 28 U.S.C. §§ 1291 and 2253(c). See Lambert v. Blackwell, 387 F.3d 210, 230 (3d Cir. 2004). We exercise plenary review of the District Court's legal conclusions and evaluate state-court determinations under the same standard the District Court applied. Williams v. Beard, 637 F.3d 195, 204 (3d Cir. 2011). Accordingly, Williams is entitled to relief if the state court's rejection of his claim was "contrary to" Supreme Court precedent such that application of that precedent "requires the contrary outcome" or if its decision was based on an "unreasonable application of" Supreme Court precedent such that "the state court's application of Supreme Court precedent was objectively unreasonable." Matteo v. Superintendent, SCI Albion, 171 F.3d 877, 888-90

10

(3d Cir. 1999) (en banc) (interpreting 28 U.S.C. § 2254(d)(1)).  If we determine an error

occurred, we perform an independent analysis of the evidence to determine if the error

caused harm rather than deferring to the state court's conclusion.  Bond v. Beard, 539

F.3d 256, 276 (3d Cir. 2008).

III

A

In Bruton, the Supreme Court "held that a defendant's Sixth Amendment

confrontation right is violated when a non-testifying co-defendant's extrajudicial

statement inculpating the defendant is introduced at a joint trial, even if a jury is

instructed that the confession may be considered as evidence only against the declarant."

Eley v. Erickson, 712 F.3d 837, 856 (3d Cir. 2013).  Subsequent Supreme Court cases

applying Bruton have held that redactions that allow a jury to infer that the nontestifying

codefendant is implicated violate the Confrontation Clause because they encourage jurors

to speculate about the reference and are as constitutionally problematic as a direct

accusation.  See Gray v. Maryland, 523 U.S. 185 (1998); Richardson v. Marsh, 481 U.S.

200 (1987).  Such "'powerfully incriminating extrajudicial statements of a codefendant' .

. . are so prejudicial that limiting instructions cannot work."  Gray, 523 U.S. at 192

(quoting Richardson, 481 U.S. at 207).

This Court has specifically held that, under Bruton, Richardson, and Gray, the

admission of redacted codefendants' statements that refer to defendants as "boy" or

"other guy" can sometimes satisfy the Confrontation Clause but it is an unreasonable

application of those cases to hold that the use of such terms always constitutes a

11

sufficient redaction. <u>Vazquez v. Wilson</u>, 550 F.3d 270, 279-80 (3d Cir. 2008). In

<u>Vazquez</u>, this Court criticized several decisions of the Pennsylvania Supreme Court,

including <u>Travers</u>, which the Superior Court here cited, because they "came close to

endorsing a bright-line rule that when terms like 'my boy,' the 'other guy,' or the 'other

man' are used to substitute for an actual name in a statement admitted at trial there cannot

be a <u>Bruton</u> violation." <u>Id.</u> at 281; <u>see also</u> <u>Washington v. Sec'y Pa. Dep't of Corr.</u>, No.

12-2883, slip op. at 11 (3d Cir. Sept. 1, 2015) (holding the "blanket rule" derived from

<u>Travers</u> "is not a reasonable view of the law"). Such redacted statements violate the

Confrontation Clause when they permit jurors to infer, without reference to any other

evidence, that the statement refers to the defendant. <u>Gray</u>, 523 U.S. at 196 ("The

inferences at issue here involve statements that, despite redaction, obviously refer directly

to someone, often obviously the defendant, and which involve inferences that a jury

ordinarily could make immediately, even were the confession the very first item

introduced at trial."); <u>see also</u> <u>Washington</u>, slip op. at 10 ("[T]he current state of the law

is that there is a Confrontation Clause violation when a non-testifying codefendant's

confession is introduced that names another codefendant, <u>Bruton</u>, 391 U.S. at 126, or that

refers directly to the existence of the codefendant in a manner that is directly accusatory,

<u>Gray</u>, 523 U.S. at 193-94.").

Logan's presentation of the redacted statement violated Williams' Confrontation

Clause rights. The Commonwealth's argument that clearly established federal law

permitted introduction of a redacted confession that replaced the defendant's name with a

generic term so long as a limiting instruction was given understates all that must be

12

considered under established Supreme Court precedent. As discussed above, Bruton, Richardson, and Gray teach that the use of a "generic term" in a redacted confession can violate the Confrontation Clause, especially when, in light of the number of alleged participants in the crime, a jury can easily conclude that the "other guy" is sitting at the defense table. See Vazquez, 550 F.3d at 281 ("The fact that there were only two possible shooters under [a codefendant's] statement should have made clear to the trial court that . . . [the jury] was almost certain to conclude that [the codefendant] described in his redacted statement as 'my boy' or 'the other guy' as the shooter was Vazquez because [the other possible shooter] was not on trial and the Commonwealth argued that Vazquez fired the fatal shot."). Here, the jury knew that there were only two people involved in the shooting and only two people were on trial for the crime to which Mahaffey confessed, and the Commonwealth argued that Williams was the shooter. Under these circumstances, the use of the words "his boy" was tantamount to using Williams' name and an error even though a cautionary instruction was given. Thus, the Superior Court's "application of Supreme Court precedent" allowing, as a matter of course, the use of a generic term in a two-defendant case involving a two-person crime "was objectively unreasonable." Matteo, 171 F.3d at 889-90.

B

We next consider whether the Confrontation Clause error was harmless, which requires us to ask whether it had a substantial and injurious effect on the jury to merit relief. Fry v. Pliler, 551 U.S. 112, 121-22 (2007); Vazquez, 550 F.3d at 282. "When a federal judge in a habeas proceeding is in grave doubt about whether a trial error of

13

federal law had substantial and injurious effect or influence in determining the jury's verdict, that error is not harmless." O'Neal v. McAninch, 513 U.S. 432, 436 (1995) (internal quotation marks omitted). In other words, "the uncertain judge should treat the error, not as if it were harmless, but as if it affected the verdict (i.e., as if it had a 'substantial and injurious effect or influence in determining the jury's verdict')." Id. at 435. Under this standard, "it is 'inappropriate to ask whether there was sufficient evidence to support the result, apart from the phase of the trial affected by the error. The correct inquiry is whether the error had a substantial influence on the verdict despite sufficient evidence to support the result apart from the error.'" Hassine v. Zimmerman, 160 F.3d 941, 955 (3d Cir. 1998) (quoting Yohn v. Love, 76 F.3d 508, 523 (3d Cir. 1996)). The inquiry is fact-intensive and we can consider issues such as the quantity and credibility of other incriminating evidence. Bond, 539 F.3d at 276 (holding Bruton violation was harmless where an eyewitness with an unobstructed view of the shooter identified the defendant and was "absolutely certain" of the identification; another witness gave a statement identifying the defendant, although she retracted it at trial; the defendant confessed, although he contended at trial that his confession had been coerced; and the statement that violated Bruton "added little to this compelling evidence . . . , particularly since [the codefendant] provided an alibi defense and his counsel suggested in closing that [his] confession had been coerced").

We conclude that the evidence against Williams was such that the error did not have a substantial and injurious effect on the verdict. Our review of the trial record of course occurs without the benefit of intonation, facial expressions, or body language, but

14

we can still draw reasonable inferences from the record and when we do, we are not left with grave doubt about whether the error had a substantial or injurious effect on the verdict. Here, the erroneously admitted statement at most had a very slight effect on the verdict in light of the other evidence admitted at trial. First, eyewitness Willie Olds saw Williams, wearing a hooded sweatshirt, shoot Buckner and return to the pickup truck. Although Olds was not immediately forthcoming and only disclosed the information when he was incarcerated, his account is consistent with other testimony concerning the pickup truck, the approach of the shooter, the physical description and clothing of the shooter, and the shooter's actions.

Second, Peterson testified that, on the night of the murder, a man wearing a hooded sweatshirt exited a pickup truck and approached Peterson, the mother of Buckner's child, to convey a threat to Buckner. Peterson thereafter called Buckner to warn him. Although Peterson claimed that she did not provide Buckner with Williams' name, Bledsoe heard Peterson tell Buckner that "D-Bo," i.e., Williams, had conveyed the threat. App. 289.

Third, several individuals who were present at the murder scene testified that the shooter, who wore a hooded sweatshirt, exited a pickup truck and shot Buckner. Diane Pennybaker testified that she was in a car parked near the limousine, noticed a pickup truck approach and park behind her, and saw two men exit the pickup truck, and that the one wearing the hooded sweatshirt shot Buckner. The limousine driver, Ritter, also saw a hefty man wearing a sweatshirt shoot the victim, then enter a pickup truck parked across the street from the limousine.

15

Finally, two fellow inmates recounted Williams' admission about the murder. Although Fitzgerald attempted to distance himself from his taped statements in which he recounted what Williams told him about the murder, his recantation was unpersuasive as his original taped statement conformed with Ketter's testimony about Williams' statements concerning the murder.

Taken together, this evidence leaves no grave doubt about the influence of the Bruton violation on the verdict. See Bond, 539 F.3d at 276. The eyewitnesses' accounts of the murder and Williams' role in it were corroborated by Williams' own statements to two of his fellow inmates. Moreover, his intention to harm Buckner was made clear through the testimony of Peterson and Bledsoe. Finally, multiple witnesses confirmed the connection between the hooded sweatshirt-wearing shooter and the pickup truck Williams was seen exiting—both to convey the threat and to shoot Buckner. The reluctance of witnesses to be immediately forthcoming or, in the case of Fitzgerald, recantation of earlier statements concerning Williams' role, do not undermine their testimony. Each witness offered pieces of evidence that, taken together, provided a solid foundation for the jury's verdict. Thus, the introduction of the redacted confession did not have a substantial and injurious effect or influence on the verdict.

V

For these reasons, we conclude that a Bruton violation occurred but that it did not have a substantial or injurious effect on the verdict. We will therefore affirm.

16